Filed 12/30/13  P. v. King CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JAMES EDWARD KING,<br><br>        Defendant and Appellant. | H036078<br>(Monterey County<br>Super. Ct. No. SS972329) |

Defendant James Edward King was convicted by jury trial in 2010 of three counts of aggravated sexual assault on a child under 14 (Pen. Code, § 269, subds. (a)(1), (a)(4), (a)(5))[1] and one count of lewd conduct on a child under 14 (§ 288, subd. (a)).  The court found true allegations that defendant had suffered a prior strike conviction that was also a serious felony conviction (§§ 667, subd. (a), 1170.12) and that he had served a prison term for a prior felony conviction (§ 667.5, subd. (b)).  Defendant was committed to state prison to serve a term of 30 years to life consecutive to a five-year determinate term.

On appeal, defendant contends that the judgment must be reversed because the trial court prejudicially erred in (1) permitting the victim to testify about her motivation for testifying at the 2010 trial (which was a retrial after the 1997 verdicts were vacated by

---

[1]        Subsequent statutory references are to the Penal Code unless otherwise specified.

a federal court), (2) terminating recross-examination of the victim, (3) admitting into evidence a portion of a video of the victim's 1997 police interview (the prosecution's video) and portions of her 1997 trial testimony, (4) refusing to allow the defense to display a brief excerpt from the video of the victim's 1997 police interview while cross-examining the victim, (5) refusing to redact statements by the police in the prosecution's video, (6) permitting an expert witness on child sexual abuse accommodation syndrome (CSAAS) to testify that false accusations rarely occur in child molestation cases, (7) allowing the prosecution's video to be sent into the jury room after ruling that this video would not be sent into the jury room, (8) permitting the jury to view in the jury room a different version of the prosecution's video than had been admitted into evidence, and (9) denying defendant's new trial motion based on juror misconduct without an evidentiary hearing. We reject his contentions and affirm the judgment.

## I. The Prosecution's Evidence

J. was 13 years old in the summer of 1997. She and her mother lived in rented rooms in a Salinas house owned by Doug Dobell, who also lived there. Defendant, who was 42 years old, was a friend of J.'s mother and Dobell, and defendant had previously lived in Dobell's house before J. and her mother lived there.[2] Around August 1, 1997, defendant came to the house to visit J.'s mother and J.'s mother's friend Eric Barton, who was a longtime friend of defendant. Defendant asked if J. could come with him to the liquor store so she could get a soda. J.'s mother agreed, and defendant drove J. to a nearby liquor store. He bought beer, and she got a soda.

On their way back, defendant pretended to be lost. He "spread her legs apart," "put two fingers" in her vagina, and then put his fingers in his mouth. She "told him no."

---

[2] J., her friend Erica Meharg, and J.'s mother called defendant "Boots."

2

When they returned to the house, J.'s mother and Barton were in J's mother's room with the door closed.[3] J. got a book from her room, "laid down on the couch," and began reading her book. Defendant put the beer away in the refrigerator. J.'s mother came out of her room, got a beer, and returned to her room. J. did not tell her mother what had happened with defendant in the car because she was "scared" that her mother would "[l]ose her temper."

Defendant "grabbed [J.'s] arm," covered her mouth, and pulled her to the garage. In the garage, defendant forced J. down on a piece of carpet and proceeded to commit a series of sex acts on her there. While J.'s 2010 trial testimony, her 1997 statements to the police, and her 1997 trial testimony were inconsistent in terms of the order and number of sex acts, she consistently said that defendant had raped her multiple times, forced her to orally copulate him, and kissed her bare chest. Defendant interrupted his assault on her to go to the kitchen and get himself a beer before resuming his assault. Some of the "white stuff" that came out of defendant's penis during the oral copulation fell on the carpet. When defendant was done committing these sex acts on her, he threatened to kill her if she told anyone. Both of them then returned to the living room.

J. did not immediately tell her mother of these events. The first person J. told about defendant's assault on her was J.'s friend Erica Meharg. A week or two later, J. told her mother. She did not tell her mother right away because she "was scared." After J. told her mother, her mother "lost it" and was "[y]elling and screaming." The next day, J. was taken to the police station and told the police about the incident during a video-recorded interview.

---

[3] J.'s mother had testified at the 1997 trial that she and Barton were taking a shower that was so long that the hot water ran out. She estimated that their shower took about 30 minutes.

Nearly three weeks after the incident, J. was examined by a sexual assault examiner. J.'s genitals were "very red" at the time of the examination due to an unrelated vaginal yeast infection. Nevertheless, the examiner saw a "red spot" on the roof of J.'s mouth, "red streaks" on her cervix, and "red dots" and a "cleft" on her hymen that the examiner believed could have been caused by the sexual assault that J. described. The examiner concluded that her observations were consistent with J.'s report of the assault. She explained that, for her, "consistent with" meant that "it is possible it happened this way."

## II.  The Defense Case

The defense pointed out numerous inconsistencies between J.'s 2010 trial testimony, her 1997 trial testimony, her 1997 statements to the police, and her other statements to the prosecution. J. testified at the 2010 trial that the first sex act in the garage was rape, and defendant never asked her to touch him or made her touch him. At the 1997 trial and in her 1997 police interview, J. testified that the first thing that happened in the garage was that defendant forced her to touch his penis before raping her. At the 2010 trial, J. testified that the first rape was followed by defendant kissing her chest, after which he went to the kitchen for a beer, and then returned to rape her again and then forced her to orally copulate him. In her 1997 statement to the police, she said that the next sex act after the first rape was the oral copulation, followed by another rape, followed by the kissing of her chest, followed by another rape before he went to the kitchen for a beer, and one more rape after he returned. In her 1997 trial testimony, she testified that the second sex act was oral copulation, followed by a rape, followed by his trip to the kitchen for a beer, followed by a second oral copulation, a rape, the chest kissing, and another rape.

The defense also pointed out that J. described defendant during the rapes having his hand over her mouth, holding her arms over her head, and also using his hands to

4

push her clothing aside. The defense also highlighted the fact that the garage was adjacent to the kitchen, and the door between the kitchen and garage had a large clear window in it. The defense cast doubt on J.'s testimony based on her claim that the assault had lasted 75 minutes.

The defense made much of the fact that no semen had been found on a carpet remnant seized by the police. Because J. had reported that defendant ejaculated onto the carpet, a police officer was sent to her house to collect the "light brown" carpet in the garage that J. had described.[4] Dobell directed the officer to a carpet remnant in the garage. The officer collected the dirty "light brown" carpet remnant that Dobell directed him to. A lab test on this carpet remnant was negative for semen. When J. was told in November 1997 of the lab test result, she said that a dog had chewed up part of the carpet, and her mother had cut off that portion and thrown it away. At the 1997 trial, J. testified that the carpet was blue. When she testified at the 2010 trial, J. said that she could not recall what the carpet looked like. Dobell testified that there had previously been a blue carpet at that location in the garage.

The defense identified inconsistencies in J.'s statements about who, what, and when she had told others of the assault. J. testified at the 2010 trial and at the 1997 trial and told the police in the 1997 interview that the only two people she had told were Meharg and her mother. She testified in 2010 that she told Meharg the day after the incident while the two girls were roller blading outside. During the 1997 police interview, she said that she told Meharg on the same day as the incident. Meharg testified at the 2010 trial that J. told her in J.'s bedroom and that Dobell was home at the time. It was undisputed that Dobell had left the house to spend a week in Las Vegas a day or two

---

[4] At the 1997 trial, J. testified that defendant ejaculated into her mouth. She "tried to spit it back out, and some of it went on the carpet." Defendant told her not to spit it out but to swallow it, so she only spit a little on the carpet.

before the incident. Dobell testified that J.'s mother and J. told him that J. had been molested, which was what motivated him to call the police. J. told the police in 1997 that she had told Eli about defendant's assault. J. testified at the 2010 trial that she told the police that she had told "the whole story" to her mother. After the police told her that her mother had said that J. had told her only that defendant tried to have sex with her but did not succeed, J. "changed her story" and told the police that she had not told her mother everything because she did not want to upset her.

The defense presented evidence aimed at suggesting that the allegations had been fabricated and made by J. at her mother's behest. Evidence was presented that, on the day after J. told her mother about defendant's assault, J.'s mother left the house because "she was fighting with" Dobell. Dobell and defendant were friends. Dobell contacted the police, and, when the police arrived and asked J. if she had been sexually assaulted by Dobell, she said no. Then they asked her if anyone had assaulted her at the house. She again said no.[5] The police then told her that Dobell had said that J.'s mother had told him that defendant had sexually assaulted J. J. responded by telling the police that defendant had assaulted her. Barton testified that J.'s mother had tried to sell a moped in late July 1997, and defendant had told her that she could not do so because the moped belonged to Dobell. That made J.'s mother angry, and she said "I'll get you back." J.'s mother had testified at the 1997 trial that Dobell had accused her of taking his property and damaging his house. Dobell testified that, when he drove J. and her mother to the hospital for J. to be examined by the sexual assault examiner, J's mother told him that she was upset with him "for having called the police before she and her daughter could . . . get their story straight." Greg Pete Manibusan (Pete), J.'s mother's former boyfriend, testified that he

---

[5] J. testified on direct examination at the 2010 trial that she said no because "I did not know why they were there."

had told J. to tell him if anyone ever did anything improper to her. He was staying at Dobell's house for a few days before and after the incident, and J. "appeared normal."

The defense presented testimony by Barton aimed at showing that defendant had no opportunity to be alone with J. in the garage and that J. did not exhibit any antipathy toward defendant. Barton testified that he had been to J.'s home three times and had seen her hug defendant there. He was there on the day of the incident, as were J., her mother, "Pete," "Bonnie," and "Eli."[6] Barton remembered J. seeking and obtaining her mother's permission to go with defendant to the store. They were gone for about 15 minutes. When they returned, Barton and J.'s mother left her bedroom, and Barton and defendant went into the back yard to smoke and drink beer. Barton insisted that Pete and Eli were also at the house at that time. Barton saw J. in the living room putting on her roller skates. After "a few beers," Barton and defendant left the house. On their way out, J., as she usually did, "gave us both a hug." Defendant and Barton went to defendant's cousin's house, where they spent the rest of the day.

The defense also presented evidence directed toward establishing that J. had been sexually assaulted by someone other than defendant. Sometime after J. reported the molestation to the police, Dobell found some letters and a diary in J.'s room, and, in November 1997, he gave these to the prosecutor's investigator. One of these letters, exhibit 11, was introduced at trial. The letter expressed romantic feelings for someone

---

[6]    Barton's testimony was heavily impeached. He had multiple felony convictions, and he admitted that defendant was his close friend. Barton had not mentioned the presence of other people in the house at the time of the incident when he testified at the 1997 trial or when he spoke to a defense investigator. J.'s mother had testified at the 1997 trial that Eli, Bonnie, and Pete were not at the house at the time of the incident. She testified that Bonnie and Pete had been staying at the house but they were away from the morning until the evening on the day of the incident. Pete's testimony confirmed as much. The prosecutor argued to the jury that Barton "was utterly lacking in credibility here."

7

and encouraged that someone to come see her at night. Although J. testified that exhibit 11 was a letter that she wrote to defendant after the incident, the letter stated that it was to "my honey Elie."[7] Entries in the diary indicated that J. had romantic feelings for Eli and suggested that the two of them had been physically involved. In January 2010, J. told the prosecutor's investigator that she had a "mumbled or jumbled" memory of defendant making her orally copulate him in the living room. In February 2010, J. told the investigator that the incident in the living room had not involved defendant but instead Eli. At the 2010 trial, J. testified on direct examination that she now remembered that she had "perform[ed] oral sex in the living room" on "my mom's friend Eli" some time in 1997 though she had not told the police about that until 2010. She said that she did not reveal this incident because "[m]y mom didn't believe me." J.'s mother had testified at the 1997 trial that Eli stayed at the house for two nights while Dobell was gone. J.'s mother saw J. touching Eli's hair. J. also testified that she had been sexually assaulted by friends of her mother when she was eight years old and four years old.

The sexual assault examiner's testimony was heavily challenged on cross-examination. She conceded that most of the redness was from the yeast infection, but she insisted that the yeast infection could not account for the red spots, the streaks, and the mouth injury. A doctor who specialized in medical evaluation of sexual abuse testified as an expert for the defense. He testified that "genital injuries heal quickly," generally within a week. A study had shown that, except in "very rare" cases where there are "horrific" injuries, bruises and abrasions would not be present three weeks after an assault. He explained that redness is "a nonspecific finding, and because of its uncertain clinical significance, is not considered to be certain evidence of trauma." The defense

---

[7] J. testified that she "was confused and lost and had mixed feelings" about defendant's assault on her. "I figured it was part of life, so I thought I had feelings for him."

8

expert had reviewed the evidence of J.'s examination, and he concluded that "there was nothing about her physical exam that appears to be abnormal insofar as evidence of prior trauma." Nothing found by the examiner "appeared to be healing trauma." The defense expert saw no physical evidence of a sexual assault. The defense expert had reviewed the examiner's photographs of J.'s hymen and found that there was no "cleft" or "notch." In addition, studies had shown that "superficial notches" are normal and not the result of abuse. He saw no evidence of a bruise to the roof of J.'s mouth.

### III. Procedural Background

In September 1997, defendant was charged by information with three counts of aggravated sexual assault on a child under 14 (§ 269, subds. (a)(1), (a)(4), (a)(5)), and one count of lewd conduct with a child under 14 (§ 288, subd. (a)).[8] It was further alleged that he had suffered a prior serious felony and strike conviction (§§ 667, subd. (a), 1170.12), and had served prison terms for two prior felony convictions (§ 667.5, subd. (b)).[9] He was convicted at a December 1997 jury trial, but a federal district court in 2009 granted defendant's petition for a writ of habeas corpus and vacated his convictions. Defendant was retried in 2010.

The prosecutor acknowledged in her argument to the jury that "[t]his isn't a case that is going to turn on physical evidence." "This is a case that turns on witness testimony, J[.]'s testimony." "The most important witness in this case is J[.] If you didn't believe her when she testified in court . . . , you should find him not guilty.

---

[8] The aggravated sexual assault counts were based on rape, forcible oral copulation, and forcible sexual penetration. Defendant was also originally charged with oral copulation with a child under 14 (§ 288a, subd. (c)), but this count was dismissed at some point.

[9] The prior conviction and prior prison term allegations were bifurcated.

Bottom line. If you watch that video of her as a child telling the police about being sexually assaulted by the defendant and you didn't think she was being truthful, you don't think that really happened, then find him not guilty."

Defendant's trial counsel argued that J. could not be believed because her statements were inconsistent, the carpet upon which she said semen had fallen was found to have no semen on it, and the sexual assault examination produced no physical evidence that a sexual assault had occurred. "There is no physical evidence, ladies and gentlemen, to support this claim. So everything boils down in the end to J[.]'s word. It's all on her word. And her word alone."

During its deliberations, the jury requested a read back of J.'s testimony, Meharg's testimony, and the testimony of another witness. The jury returned guilty verdicts on all four counts. Defendant waived his right to a jury trial on the prior conviction and prison prior allegations. The prosecutor dismissed one of the prison prior allegations. The court found true the remaining prior conviction and prison prior allegations.

Defendant moved for a new trial on various grounds including juror misconduct. The court denied the new trial motion and sentenced defendant to 30 years to life in prison consecutive to a five-year determinate term. Defendant timely filed a notice of appeal.[10]

## IV. Discussion

### A. J.'s Testimony About Her Motivation For Testifying

Defendant contends that the trial court prejudicially erred in permitting J. to testify over objection about her motivation for testifying at the 2010 retrial.

---

[10] Defendant has also filed a habeas petition, which we dispose of by separate order.

### 1. Background

The defense moved in limine to exclude evidence of J.'s "motivations" for testifying at the retrial. J. had stated that she wanted to testify because she now had a young child and wanted to prevent defendant "from molesting any other children." The defense claimed that such testimony would be irrelevant and "highly prejudicial" under Evidence Code section 352 as it would appeal to the jury's sympathy.

The prosecution argued that J.'s motivations for testifying were "relevant in terms of judging her credibility." "[H]er reasons for being here as an unsubpoenaed witness [are] very relevant to her credibility in this case, as she is coming here twelve years later to testify." "[I]t is a key issue in terms of her credibility for the jury to know why she's still willing to come here after twelve years and testify in this case."

The court ruled "at the outset that the prosecution ought not to go there. After you gentlemen [the defense] have at her, I may have a different feeling about what she may talk about." "I assume you're going to insinuate that she's lying, and then it may be relevant to ask what her motivation is for being here."

Defendant's trial counsel's cross-examination of J. was aimed at demonstrating that she had made up her allegations against defendant. On redirect, the following colloquy occurred: "Q Were you subpoenaed to testify here in court? [¶] [Defense counsel]: Objection, your Honor. [¶] THE COURT: Overruled. [¶] Q Did someone serve you a subpoena? [¶] A Faxed to me, yes, ma'am. [¶] . . . [¶] Q Do you recall talking to Investigator Gunter about whether or not you were required to come here and testify? [¶] [Defense counsel]: Objection, your Honor, irrelevant. [¶] THE COURT: Overruled. [¶] Q Do you recall that conversation? [¶] A Yes, ma'am. [¶] Q Okay. And do you recall her giving you the option of not coming here? [¶] A Yes, ma'am. [¶] Q Okay. And that it was your choice? [¶] A Yes, ma'am. [¶] Q Okay. Why did you decide to come here? [¶] [Defense counsel]: Objection, your Honor. Can we have a sidebar on this? [¶] THE COURT: No, we've already done it. Overruled. [¶] A Can I

answer that? [¶] Q Yes, you can answer that. [¶] A I came here to make myself a stronger person and to protect my own children. [¶] [Defense counsel]: Your Honor, move to strike. [¶] THE COURT: Denied. [¶] [Defense counsel]: It's irrelevant. [¶] THE COURT: Denied. [¶] Q You have a daughter? [¶] A Yes, I do."

The prosecutor argued to the jury: "[T]he fact that you have heard absolutely no reason for J[.] to come here as a grown woman, swear to tell the truth, and then lie about this man is a huge factor in evaluating her credibility. She does not have a motive to lie. You heard that J[.] was given the opportunity to just walk away from this case, to not testify." "J[.] had zero motive to falsely accuse the defendant then in 1997 and, if possible, less than zero motive now." "J[.] did come in here, not because she had to, but because she wanted to, because this was something she felt was important to do, that she felt was the right thing to do."

Defendant's trial counsel referenced this testimony in his closing argument. "And in a last desperate gasp to try to save some shred of credibility for J[.], the prosecutor asked her why she came back here for a second trial, why she came back to [*sic*] from Colorado for a second trial. She made much of that in her argument to you a little while ago. She asked her on the stand why did you come back? And J[.]'s response was, quote, to make myself a stronger person, and to protect any children, unquote. Well, with her credibility lying like torn rags at her feet, what else would you expect her to say?"

## 2. Analysis

Defendant claims that it was irrelevant that J. had voluntarily chosen to testify and that her motivation was "to make myself a stronger person and to protect my own children."[11] "'Relevant evidence' means evidence, including evidence relevant to the

---

[11] Defendant suggests that it was improper for J. to testify that she had come from out-of-state to testify. He did not object to her testimony on that topic below, so this challenge was forfeited. Defendant also claims that J.'s testimony that her motivation (continued)

12

credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) The defense's cross-examination of J. attempted to demonstrate that she had fabricated her allegations against defendant. This claim of fabrication raised the obvious question of why J. would continue to make fabricated allegations after the passage of 12 years. J.'s testimony that she was testifying at the 2010 trial voluntarily had a "tendency in reason" to discount the inference that she was maintaining her allegations under compulsion by the prosecution. Her statement of her reasons for testifying gave the jury an alternative explanation for her willingness to subject herself to this ordeal that had a "tendency in reason" to rebut suggestions by the defense that she had a motivation to fabricate these allegations.

Defendant also contends that the trial court should have excluded J.'s testimony on this point under Evidence Code section 352. "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) "The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[All] evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is

was to protect her children was false because she had approved of a proposed plea agreement that would have led to defendant's release. He fails to note that the proposed plea agreement, which would have involved defendant pleading guilty to lewd conduct on a child under 14, necessarily would have resulted in defendant being subject to sex offender registration and its associated restrictions. Hence, the proposed plea agreement would have resulted in these restrictions, which would have protected J.'s children to some extent, while her failure to testify might have allowed defendant to be released without any such restrictions.

"prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying [Evidence Code] section 352, "prejudicial" is not synonymous with "damaging." '" (*People v. Karis* (1988) 46 Cal.3d 612, 638.) "A trial court abuses its discretion [under Evidence Code section 352] when its ruling 'falls outside the bounds of reason.'" (*People v. Wesson* (2006) 138 Cal.App.4th 959, 969.)

J.'s testimony on this point did not consume substantial time and had no tendency to confuse the issues or mislead the jury. Defendant's only possible challenge to this evidence under Evidence Code section 352 was that (1) it was likely that this testimony would create a substantial danger of undue prejudice, and (2) the risk of prejudice substantially outweighed the probative value of the evidence. The trial court could have rationally concluded that there was no danger of undue prejudice to defendant from J.'s testimony that she was testifying voluntarily to make herself stronger and protect her children. The fact that this testimony countered the defense's claim that J. had fabricated her allegations was what naturally flowed from this probative, relevant evidence. While J.'s reference to protecting her children had some potential to appeal to the jury's sympathy, this potential was not so great that it created a unique emotional bias against defendant. It is commonplace that parents want to protect their children. J.'s testimony had force only if the jury believed that J. had not fabricated her allegations; it was not likely that the jury would believe her merely because she claimed to be testifying to protect her children. The trial court did not abuse its discretion in permitting this testimony.

### B. Court's Termination of Recross-examination of J.

Defendant contends that the trial court prejudicially erred in terminating his recross-examination of J.

## 1. Background

J.'s testimony on direct examination at the 2010 trial was fairly brief. The defense cross-examination was almost twice as long. The trial court did not restrict the defense cross-examination in any way. On cross, J. conceded that she had told the prosecution, just before trial, that she "made up something" when she spoke with them in January 2010. She subsequently said that she "didn't make it up," but it was not true. She had told the prosecution in January 2010 that *defendant* had assaulted her in the living room, but she had later remembered that the living room assault was by Eli. The defense also confronted J. with numerous inconsistencies between her testimony on direct and her previous statements to the police, her testimony at the 1997 trial, and her 2010 statements to the prosecution. J. frequently responded that she could not recall. When she was given a transcript to refresh her recollection, she often said that it did not refresh her recollection. But J. did admit that she had made inconsistent statements.

On redirect, the prosecutor had J. confirm that she had testified at the 1997 trial, as she had on direct, that the first person she told was Meharg. The prosecutor also had J. recount the sequence of events in the garage. The prosecutor asked J. about her motivation for testifying, and had her look at pictures of the layout of the house. The prosecutor followed up on the questions asked on cross about the incident in the living room. J. testified that she had initially misremembered that incident and thought it was with defendant. The prosecutor asked her about "Pete," and she said she did not remember him or know him well. J. confirmed that she could not remember the date of the incident and could not remember if she touched defendant's penis. The prosecutor had J. explain where defendant's hands were at various times during the incident. The prosecutor also followed up on diary entries and letters she had written. J. was also asked about the color of the carpet, and she confirmed that she did not remember. Finally, she testified that her memory of the events was better in 1997 than it was now.

15

On recross, J. was first asked several questions about who she told first, Meharg or her mother. Then, she was asked about the sequence of events in the garage. After numerous questions on this subject, this colloquy occurred: "THE COURT: I think this has all been asked and answered at least once. [¶] [Defense counsel]: She went back into this in redirect. [¶] THE COURT: You've got about five, [defense counsel], so take your shots." Defendant's trial counsel proceeded to show J. photos of the house and asked about the window in the door between the kitchen and the garage. He went on to ask briefly about "why you're back here today." The next area of questioning was about the incident in the living room that she had "misremembered" followed by questions about J.'s letters and her diary entries. Defendant's trial counsel further questioned J. about the carpet and its color.

After a group of questions about the carpet, the prosecutor objected that "this has all been asked and answered." The following then occurred. "THE COURT: Sustained. In fact, we're going to end this right now because this could go on forever the way you're approaching it. [¶] So ladies and gentlemen, we're going to take the evening recess at this time. We're recessing until next Monday, the 1st of March, at 9:00. [¶] [The Prosecutor]: Your Honor, may we approach first? [¶] THE COURT: Sure." An off-the-record sidebar occurred, and then the court recessed. Defendant's trial counsel made no objection on the record.

When the trial resumed a few days later, defendant's trial counsel asked to address the court outside the presence of the jury. He recounted the events at sidebar. "District Attorney expressed a concern about having the witness come back to court to testify. [¶] Your Honor, indicated that . . . we were done with J[.], and that she would not be coming back. That the cross-examination -- direct examination of J[.] was completed. [¶] We -- the defense was not done with our cross-examination of her, and the Court indicated that it was not going to allow any further testimony from her, but we did not in any way on the record or off the record agree to excuse her. There were areas that we would have

16

continued to proceed with her. [We] had a number of questions based on examination done on redirect by the prosecution that [we] would have addressed. And if the Court wants us to, we can make a full record of that at this time of other areas that [we] would have cross-examined her to. [¶] But our fundamental objection is that the Court summarily cut off the cross-examination of this witness before the defense had completed its cross-examination. There was not an option given of how much more time do you need? Can we go another five minutes? There was -- the Court just summarily said that's it, we are done with this witness. . . . [¶] . . . We feel that that has impaired [defendant's] right to a full cross-examination of the key witness in the case against him. And, again, had we had an opportunity to, we could have finished that recross that afternoon in a short period of time. Instead, . . . the chief witness against the defense, has now returned to Colorado. [¶] We would not have agreed to excuse her. . . . The Court never asked is this witness excused? It just excused her on its own without giving the defense an opportunity to object to that. [¶] So for those reasons, we would ask the Court to order that J[.] be brought back so that we can finish the cross-examination of this critical witness." "We were not given a full and complete opportunity to cross-examine, thereby denying [defendant] his constitutional rights under both California and federal constitutions . . . ."

The prosecutor responded that, when "the Court indicated that [J.] was [excused], the defense did not voice an objection at that time, and she has since been returned to Colorado." She also recounted that "the defense cross-examined [J.] for hours when she was on the stand. She was on the stand for pretty much the entire day, and toward the end, it got to the point where the defense was asking the same questions over and over again, and was simply retreading questions that had been already covered during the original cross-examination of her. [¶] The Court gave the defense a time warning that they needed to wrap up the questions . . . ."

17

The defense responded: "There was no waiver of anything here. The Court was clear. The Court was upset with the defense cross-examination. Your Honor made a ruling, and said that's it, we're done with this witness. There was no opportunity given to defense to object to that because the next thing that happened, once we left the sidebar, was the Court went back on the record and excused the jury until today's date, and your Honor left the bench, and there was no opportunity for us to make any argument at that time."

The court rejected the defense request. "I wasn't upset. Secondly, no one did voice any objection when I said she was going to be excuse[d]. [¶] Court has an obligation to control the proceeding. The Court felt that defense had more than adequate opportunity to examine and cross-examine this witness. The cross-examination was far longer than the direct, which is pretty much unusual, then went back for a second round. I did warn [defendant's trial counsel] that he had about ten [*sic*] minutes. It went on well past that. And, finally, I felt that it was necessary to call a halt because, as the District Attorney points out, it didn't seem like we were covering any new ground; we were simply rehashing things one more time. That's the reason the Court ruled as it did."

## 2. Analysis

Defendant claims that the trial court violated his "right to confrontation" by failing to afford him "the 'wide latitude' demanded by the right to confront and cross-examine."

" 'Generally speaking, the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " (*People v. Wilson* (2008) 44 Cal.4th 758, 794.) "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679.) "A trial court's limitation on cross-examination pertaining to

the credibility of a witness does not violate the confrontation clause unless a reasonable jury might have received a significantly different impression of the witness's credibility had the excluded cross-examination been permitted." (*People v. Quartermain* (1997) 16 Cal.4th 600, 623-624.)

Defendant cites no cases concerning a trial court's restriction on ***recross-examination***, as opposed to cross-examination. The Attorney General suggests that the right to confrontation cannot be abridged by a limitation on recross so long as there has been a full opportunity for cross. She cites no authority for this proposition. Defendant responds that his right to confrontation has the same force during recross, at least where the prosecution's redirect is, as he maintains it was here, "wide in scope and important." He too cites no authority for his argument.

Although we are aware of no authority specifically addressing restrictions on recross, we are persuaded that the right to confrontation does not disappear after cross. On the other hand, we are certain that a trial court's discretion to restrict unproductive questioning is broader on recross than it is on cross. Since the scope of cross operates as a limit on redirect and, in turn, the scope of redirect limits recross, the scope of recross is necessarily narrow. The defense has already had a full opportunity to address everything that the prosecution has addressed on direct, and the prosecution's redirect cannot delve into new subject matter. What little material remains for recross will often be limited to reemphasizing points made during cross. We should not be misunderstood to be denying the importance of recross. Recross may have significant importance where redirect reveals something that has not yet been addressed on cross. And a trial court may violate a defendant's right to confrontation if it refuses to permit recross on such a matter. The question here is whether the trial court's restriction did so.

The only additional matters addressed on redirect were J.'s motivation for testifying, followup on her testimony on cross about the living room incident and her diary entries and letter, J.'s inability to recall whether she had touched defendant's penis,

and J.'s testimony about the locations of defendant's hands during the incident. At the point when the court notified defendant's trial counsel that "I think this has all been asked and answered at least once," and told him that "You've got about five, [defense counsel], so take your shots," the questions on recross had not been devoted to any new material but instead had been primarily devoted to topics already well covered on cross. Following this warning, defendant's trial counsel moved on to questions about the living room incident, entries in J.'s diary, and her letter. After that, however, he returned to the topic of the carpet, which had already been addressed on cross. By this time, defendant's trial counsel had clearly exceeded the "five" that the trial court had warned him he had left for his "shots," and he had returned to asking questions that had already been answered. Because defendant's trial counsel had already been warned by the trial court, and he had chosen to return to an old rather than new topic, the trial court could reasonably conclude that he had exhausted his questions about any new topics. When defendant's trial counsel persisted with further questions about the carpet, and the prosecution interposed an "asked and answered" objection, the trial court was well within its discretion in deciding that it was necessary to terminate recross because further recross would be "repetitive or only marginally relevant," and would only serve to harass J. (*Delaware v. Van Arsdall*, *supra*, 475 U.S. at p. 679.) The trial court did not violate defendant's right to confrontation by doing so.

## C. Admission of J.'s 1997 Trial Testimony and Video and Transcript of 1997 Police Interview of J.

After J. had been excused as a witness at the 2010 trial, the trial court granted the prosecution's request for admission of a video of a portion of the 1997 police interview of J., a transcript of that portion of the interview, and a portion of J.'s 1997 trial testimony. Defendant contends that the admission of this evidence violated his

20

confrontation rights and was also error under state law because it was inadmissible hearsay not within any exception.

## 1. Background

The defense moved in limine to exclude on hearsay grounds J.'s out-of-court statements. It argued that such statements were not admissible as "fresh complaints" or under any other hearsay exceptions. The prosecution's exhibit list attached to its trial brief listed the video of J.'s 1997 police interview and the transcript of it as trial exhibits. The prosecution sought an in limine ruling that J.'s out-of-court statement to Meharg was admissible as a fresh complaint. The admissibility of J.'s out-of-court statements was not litigated prior to J.'s testimony.

J., who was 25 years old at the time of the 2010 trial, was the prosecution's first witness. On direct examination, she testified that she could not recall what time of year the events took place, what defendant's car looked like, or what defendant did after putting his fingers inside her in the car. The prosecutor showed J. portions of a transcript of her 1997 trial testimony (the trial transcript), and J. was able to refresh her recollection on those points. However, even after reviewing other portions of the trial transcript, she could not recall the name of the store that defendant took her to or what he said to her in the car. J. testified on direct that, prior to coming to court to testify, she had watched the video of her 1997 police interview (the interview video) and reviewed the trial transcript, and they had refreshed her recollection. Yet there were "still things I don't remember."

During cross-examination, defendant's trial counsel utilized portions of the trial transcript to refresh her recollection that "Pete" was living at the house and in what room he was staying. He also used the trial transcript to refresh her recollection that she had testified that she did not "flirt with" defendant and to refresh her recollection of defendant's body position in the garage during the sex acts. He also used the trial transcript to refresh her recollection of whether defendant had said anything to her in the car when he acted like he was lost. The trial transcript was also used to refresh J.'s

21

recollection that she had testified in 1997 that the second sex act was oral copulation and that there were two acts of oral copulation.  The trial transcript was used to refresh J.'s recollection that she testified that she told her mother first, but she insisted that she had actually told Meharg first.  The trial transcript was used to refresh J.'s recollection that she had testified that she never told Eli what happened, but J. insisted that she had told Eli.  It was also used to refresh her recollection about her testimony about the carpet.

Defendant's trial counsel used portions of the trial transcript and the transcript of the 1997 police interview (the interview transcript) to attempt to refresh J.'s recollection that the first sex act in the garage was her touching defendant's penis, but she initially said she could not recall.  Then she stated that she had told the police that the first sex act was her touching defendant's penis.  Defendant's trial counsel also used portions of the interview transcript to refresh J.'s recollection of her conversation with defendant as he dragged her to the garage.  He used both transcripts to attempt to refresh J.'s recollection of the length of the garage incident, but she said she could not recall.  The interview transcript was used to refresh her recollection about the assault when she was eight years old.  The interview transcript was also used to refresh her recollection about what she had told the police she had told her mother.  Defendant's trial counsel also sought, but was denied the opportunity, to show to J. an excerpt from the interview video (exhibit Z) on this same point.

The prosecutor utilized the trial transcript on redirect a few times to refresh J.'s recollection and a couple of times to unsuccessfully attempt to refresh her recollection.  She did not utilize the interview transcript at all.  Defendant's trial counsel did not utilize either transcript or the video on recross.

J. testified on direct examination that her memory of the incident was better at the time of the 1997 interview than it was at the 2010 trial and that she was truthful at that time.  J. testified that, although she was able to refresh her recollection of some things, "[t]here's still things I don't remember."  On cross-examination, J. confirmed that, during

22

the 1997 interview, she "told them the entire truth." She also confirmed that she had told the truth at the 1997 trial. On redirect, J. testified that her memory of the events was better at the 1997 trial and that she had testified truthfully at the 1997 trial.

After J. had testified and been excused, the prosecution filed a written motion seeking admission of portions of the interview video. The prosecution asserted that this evidence was admissible as past recollection recorded, prior inconsistent statements, and prior consistent statements. At the same time, the prosecutor sought permission to read portions of J.'s 1997 trial testimony to the jury. She asserted that this evidence was also admissible as past recollection recorded, prior inconsistent statements, and prior consistent statements.

The defense opposed these requests. It argued that this evidence would be "duplicative and prejudicial" and should have been presented when J. was testifying. The defense also argued that this evidence was not admissible as past recollection recorded since J.'s memory had already been refreshed. In the defense's view, this evidence was not admissible as prior consistent statements because J.'s statements were not made before any improper motive had arisen. Prior inconsistent statements was not a valid basis because J. was no longer available to explain or deny the statements.

At a hearing outside the presence of the jury, the prosecutor noted that J. had testified that she did not remember many things, had been unable to refresh her recollection, and had been inconsistent at times with her 1997 statements and testimony. The prosecutor argued that the evidence should be admitted because 12 years had passed, and J. "just does not remember." She also claimed that the defense had misleadingly showed J. only small "snippets" of her prior statements in cross-examining her, and that it was essential that the jury hear a more complete version. The prosecutor asserted that "inconsistent statements . . . is not the basis of my motion." Instead, "[m]y motion is, more than anything, is based on past recollection recorded and prior consistent

23

statements." The prosecutor noted that the portion of the video she was seeking to introduce was "only 24 minutes in length."

The defense argued that the video and the prior testimony were "just duplicative and prejudicial, especially the extent that we can't cross-examine J[.] on these prior statements now that she is off the stand." The defense also asked that the prosecution be limited to the interview transcript and prohibited from playing the interview video for the jury. The defense objected on confrontation grounds and under Evidence Code section 352. Defendant's trial counsel argued that the introduction of this evidence would "be incredibly time consuming . . . ."

The court, citing J.'s "serious lapses in memory," ruled that the proffered evidence was admissible. The defense then sought and obtained admission of additional portions of the interview video and trial testimony. The prosecutor played a portion of the interview video during the testimony of the detective who had conducted the interview.

The prosecution's video shows J. being interviewed by a police detective wearing plainclothes. A uniformed police officer joins them part of the way through the video. J. has her small dog with her, and she pets the dog repeatedly during the first part of the video. The video quality is poor, and the audio is often indistinct. J.'s mannerisms during the video include covering her head with her arms and putting her head down on the table. Her demeanor varies from crying to laughing, and from animated to silent.

At the beginning of the video, the detective asks J. "what happened," and J. says that defendant "raped me." She says that defendant "made me touch his private spots and he touched mine, and he stuck his private spot up mine." J. is visibly embarrassed in relating this information. She describes how these events occurred in the garage on the carpet. Her mother and Barton were in her mother's bedroom, and defendant was "covering my mouth so I couldn't scream." No one else was in the house. She says that the incident occurred "[a]bout two weeks ago." J. relates how defendant came over and talked to her mother "for an hour" before asking if he could take J. with him to the store.

24

Defendant drove her to the store where he got beer and she got a soda. On the way back, he "was pretending to get lost," and then he "spread my legs" and put his hand in her "private spot."

Defendant drove them back to the house. He put the beer away in the kitchen. J.'s mother came out of her room to get a beer and then returned to her room where Barton was sleeping on the bed. J. sat on the couch and began reading a book. Defendant "[g]rabbed me and he told me to come with him. And then I told him I didn't want to." "But he made me." Defendant grabbed her by the arm and pulled her to the garage. He "made me get down on the floor," "covered my mouth up," and "made me grab his private spot." After that, defendant "put his thing inside me" for "a few minutes." He did not remove her clothing. The next thing that happened was that defendant "was making me put his private spot in my mouth." "And this white stuff came out." Defendant made her swallow it, but she saw some of the white stuff continuing to come out of his penis. Defendant returned his "thing" to her private spot. Defendant proceeded to kiss her chest. He pulled up her shirt and removed her bra before he did this. After that, defendant kissed her on the mouth. He followed this up by putting "his thing in mine" again and "pushing really hard and it hurt." It was at this point that defendant "got up and he told me to stay there. Then he went in and he got his beer and he took a drink off of it, then he came back and then that's when he put it in me again." This was the final sex act. However, "before he let me get up, he told me that if I told (inaudible) he would kill me."

Although she describes four rapes during the interview, before she does so J. tells the detective that there were three rapes and one oral copulation. Asked about the length of the incident, J. states that it "was an hour and fifteen minutes, I think." She says that the first person she told was her friend Erica, who she told "[t]hat exact same day." J. tells the detective that the only other person she told was her mother, who she told "yesterday."

25

Near the end of the trial, portions of J.'s 1997 trial testimony were read into the record. J. had testified at the 1997 trial that her mother had been drinking beer with defendant and Barton for an hour or two before defendant went to the store to get more beer. On their way back from the store, defendant "pretended to get lost." Then he "yelled" at her to "spread my legs." After they returned to the house and J. was lying on the couch, defendant "came in and told me to go with him," "told me he just wanted to show me something," and when she declined, "dragged" her by the arm into the garage. Defendant told her not to scream, and he intermittently covered her mouth during the incident. He made her lay down in the garage, and he unzipped his pants. J. testified that the first thing that happened in the garage was that defendant got down on his knees and "made me touch his private part" and "squeeze it and rub it." The next thing that happened was that he put his penis in her mouth. Then he put his penis in her vagina. He had one hand holding J.'s hands above her head, while he used the other hand to push her clothing aside. His penis was in her vagina for "a few minutes," and it "hurt." After that, defendant went to the kitchen "real quick" and got a beer. When he returned, he put his penis in her mouth again and ejaculated into her mouth. She "tried to spit it back out," but defendant told her to swallow it and she did so. "[A] little" of the "[w]hite stuff" "went on the carpet," which she described as a blue carpet. After that, defendant put his penis back in J.'s vagina and "was pushing really hard." In between two of the rapes, defendant pulled up her shirt, removed her bra, touched her breasts, and kissed her chest. Defendant then put his penis back in her vagina.

J. testified at the 1997 trial that the first person she told was her friend Erica, and the next person she told was her mother. J. had also testified that the event when she was eight years old involved a man doing "different" things to her than what defendant did.

## 2. Analysis

### a. Confrontation Clause

Defendant contends that his confrontation rights were violated by the admission of the video, the interview transcript, and portions of J.'s trial testimony because J. had already been excused before this evidence was admitted into evidence and therefore was "no longer" subject to cross-examination. He argues that the prosecution was required to establish that J. was "unavailable" in order to justify admission of this evidence.

*Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) bars the "admission of testimonial statements of a witness *who did not appear at trial* unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." (*Crawford*, at pp. 53-54, italics added.) "Testimonial statements of witnesses *absent from trial* [are admissible] only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." (*Crawford*, at p. 59, italics added.) "[W]e reiterate that, when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements. . . . The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it." (*Crawford*, at p. 59, fn. 9.)

Since J. testified at trial and was subject to cross-examination, defendant was not deprived of his confrontation rights as delineated in *Crawford*. Nevertheless, defendant insists that his opportunity to cross-examine J. at trial was constitutionally inadequate because it occurred *prior to* the admission of this evidence. Defendant provides no authority for this claim. Defendant relies on *Crawford*'s statement that the confrontation clause "does not bar admission of a statement so long as the declarant is present at trial to defend or explain it." (*Crawford*, *supra*, 541 U.S. at p. 59, fn. 9.) He claims that J. was no longer present at trial to defend or explain this evidence because she had already been excused when the evidence was admitted into evidence.

27

"[T]he phrase 'defend or explain' in footnote 9 of *Crawford* does not mean that when a witness denies making, or claims lack of recollection of, a particular statement, admission of the statement violates a defendant's right to confrontation. [Citation.] This is made clear by the first sentence of the same paragraph of the footnote, which broadly states that when a declarant 'appears for cross-examination at trial, the confrontation clause places no constraints at all on the use of his prior testimonial statements.' [Citation.] Nothing in *Crawford* casts doubt on earlier cases holding that the Confrontation Clause is not violated by the introduction of out-of-court statements a witness denies or does not recall making." (*People v. Dement* (2011) 53 Cal.4th 1, 24.)

Although *Dement* did not address defendant's precise contention, it reflects that *Crawford* did not mandate that the admissibility of a prior statement of a witness *who is present for cross-examination at trial* depends on whether the witness has actually been confronted with the prior statement and required to or had the opportunity to defend or explain the prior statement. Here, because J. "appear[ed] for cross-examination at trial, the Confrontation Clause place[d] no constraints at all on the use of [her] prior testimonial statements." (*Crawford*, *supra*, 541 U.S. at p. 59, fn. 9.)

Defendant complains that he "was never given the opportunity to cross-examine J[.] about the particulars" of the prior statements. Not so. The defense extensively cross-examined J. about "the particulars" of her prior statements, repeatedly using the trial transcript and the interview transcript to refresh her recollection and to point out her inconsistencies. Nor should it have been a surprise to the defense that the prosecution obtained admission of this evidence. The interview transcript and the video were both on the prosecution's exhibit list attached to its trial brief, and the prosecution used the trial transcript repeatedly throughout its direct examination of J. to refresh or attempt to refresh J.'s recollection. Hence, we reject defendant's claim that the defense "was taken utterly by surprise and was justifiably outraged" by the prosecution's "sandbagging" request for admission of this evidence.

28

### b. Hearsay

Defendant also claims that the trial court erred in admitting this evidence because it was hearsay not within any exception. The trial court did not specify the precise basis for its ruling, but, on appeal, the Attorney General, like the prosecutor below, relies on past recollection recorded and prior consistent statements as justifications for the admission of this evidence. Defendant claims that the prosecution failed to establish a foundation for the admission of this evidence under either of these hearsay exceptions.

Past recollection recorded is admissible under Evidence Code section 1237, which provides: "(a) Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement would have been admissible if made by him while testifying, the statement concerns a matter as to which the witness has insufficient present recollection to enable him to testify fully and accurately, and the statement is contained in a writing which: [¶] (1) Was made at a time when the fact recorded in the writing actually occurred or was fresh in the witness' memory; [¶] (2) Was made (i) by the witness himself or under his direction or (ii) by some other person for the purpose of recording the witness' statement at the time it was made; [¶] (3) Is offered after the witness testifies that the statement he made was a true statement of such fact; and [¶] (4) Is offered after the writing is authenticated as an accurate record of the statement. [¶] (b) The writing may be read into evidence, but the writing itself may not be received in evidence unless offered by an adverse party." (Evid. Code, § 1237.) "[A] videotape is properly considered a writing." (*People v. Archer* (1989) 215 Cal.App.3d 197, 207.)

Each necessary foundational element for admission of past recollection recorded was established. J.'s 2010 trial testimony reflected that she "has insufficient present recollection to enable [her] to testify fully and accurately." She repeatedly answered that she did not recall, and she was often unable to refresh her recollection even by reviewing the trial transcript or the interview transcript. J. testified that the events were fresh in her

mind when the video was made and that she still recalled the events when she testified at the 1997 trial. Both the trial transcript and the video were made for the purpose of recording her statements. J. testified that her trial testimony and her statements during the police interview were true. The authenticity of the trial transcript, the video, and the interview transcript were unchallenged, and the defense implicitly conceded as much by utilizing both transcripts in its cross-examination of J. Finally, for purposes of the admission of "the writing itself," here the interview transcript and the video, the prosecution was the "adverse party" because it was the defense that relied heavily during cross-examination on the interview transcript in attacking J.'s testimony.[12]

Defendant argues that this evidence was not admissible as past recollection recorded because J. "remembered the 1997 assault when she testified about it in 2010." Evidence Code section 1237 does not require that the witness have *no recollection* of the event. The foundational requirement is that the witness have "*insufficient* present recollection to enable [her] to testify *fully* and accurately." (Evid. Code, § 1237, italics added.) "[A]n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence, including one that turns on the hearsay nature of the evidence in question [citations]." (*People v. Waidla* (2000) 22 Cal.4th 690, 725.) The trial court explicitly found that J. had "serious lapses in memory" with regard to these events, and the record supports this finding. Her responses to questions at trial were indicative of a failure to recall fully and accurately the events in question. She repeatedly responded that she could not recall, and she was frequently unable to fully refresh her recollection by reviewing transcripts. The trial court did not

---

[12] Since the trial transcript was only read into the record and not itself admitted into evidence, it was irrelevant which party was the "adverse party" with respect to it for purposes of Evidence Code section 1237, subdivision (b).

abuse its discretion in concluding that J. had insufficient present recollection to testify fully and accurately about the 1997 events.

Defendant asserts that *People v. Hefner* (1981) 127 Cal.App.3d 88 (*Hefner*) required the exclusion of most of this evidence because it was not established that J. lacked present recollection of each and every fact that she related in the video and in the portions of her trial testimony read to the jury. In *Hefner*, the Court of Appeal found error in the admission of the entirety of the witness's prior testimony at the preliminary examination and the prior trial as past recollection recorded. The court stated that the prior testimony should have been limited to, "[a]t most, . . . those matters which Cindy testified she could not remember clearly." (*Hefner*, at p. 97.) *Hefner* was an unusual case in which the trial court sua sponte directed that the entirety of the prior testimony be read to the jury. The prosecutor had not sought its admission. (*Hefner*, at pp. 93-94.) The Court of Appeal did not recount Cindy's trial testimony, so it was unclear if she had a significant lack of recall. It merely concluded that admission of the prior testimony "in its entirety" was not merited by the requisite foundational showing. (*Hefner*, at p. 97.)

*Hefner* is distinguishable. Here, the prosecutor explicitly sought the admission of *limited portions* of the video, the interview transcript, and J.'s 1997 trial testimony. The foundational showing in support of the prosecutor's request included a record establishing that J. had a profound inability to recollect fully and accurately the events that she had recounted in these limited portions of the video and her trial testimony. Under these circumstances, the trial court did not abuse its discretion in concluding that this foundational requirement had been satisfied and therefore that the evidence was admissible as past recollection recorded.

The prosecutor also provided an adequate foundation for admission of the bulk of this evidence as prior consistent statements. "Evidence of a statement previously made by a witness that is consistent with [her] testimony at the hearing is inadmissible to support [her] credibility unless it is offered after: [¶] (a) Evidence of a statement made

31

by [her] that is inconsistent with any part of [her] testimony at the hearing has been admitted for the purpose of attacking [her] credibility, and the statement was made before the alleged inconsistent statement." (Evid. Code, § 791.)

Evidence Code section 791, subdivision (a) requires only that the prior consistent statement be "offered after" evidence of a later statement "inconsistent with any part of [her] testimony at the hearing has been admitted for the purpose of attacking [her] credibility . . . ." The statute does not require that the prior consistent statement concern the exact same fact as the prior inconsistent statement. The credibility focus of the statute and its broad reference to a statement that is inconsistent "with any part" of the witness's testimony suggests that the statute was intended to permit prior consistent statements to be admitted to support a witness's credibility generally when the witness's credibility is attacked with a prior inconsistent statement rather than merely to rebut such an attack as to a particular factual issue. Here, the defense cross-examination of J. repeatedly attacked her credibility with her prior inconsistent statements to the prosecutor's investigator in 2010. Those statements were made much later than J.'s statements in the 1997 video and her testimony at the 1997 trial. Hence, her 1997 statements were admissible as prior consistent statements.

Defendant complains that the prosecution was remiss in failing to "link a *single* statement with a particular hearsay exception." He cites no authority for such a requirement but only cases holding that the proponent of hearsay bears the burden of showing the applicability of a hearsay exception. "The proponent of hearsay has to alert the court to the exception relied upon and has the burden of laying the proper foundation." (*People v. Livaditis* (1992) 2 Cal.4th 759, 778.) The prosecutor did so here. Past recollection recorded applies where the witness has "insufficient present recollection to enable [her] to testify fully and accurately." (Evid. Code, § 1237.) Where a witness lacks a sufficient recollection of the events to provide a *full account* of those events, her previously recorded statements regarding that event are admissible if the foundational

32

requirements are satisfied.  It is not necessary to show that the witness does not recall fact X or fact Y if the witness has "insufficient" recall *of the event* to which those facts relate to "fully and accurately" describe *that event*.  Similarly, if the prior statement is consistent with the witness's testimony, and the witness's testimony has been attacked with prior inconsistent statements that occurred after the prior consistent statements, there need not be linkage between the prior consistent statements and the prior inconsistent statements.

The trial court did not abuse its discretion in admitting the prosecution's video, the corresponding portion of the interview transcript, and a portion of J's 1997 trial testimony over defendant's hearsay objection.

### D.  Court's Refusal to Allow Use of Exhibit Z During J.'s Testimony

Defendant challenges the trial court's ruling precluding him from using an excerpt from the 1997 police interview video (exhibit Z) during his cross-examination of J.

### 1.  Background

During cross-examination of J., defendant's trial counsel asked her if she recalled telling the police that she had told her mother everything.  J. said that she did not recall.  Defendant's trial counsel then said:  "Your Honor, I'd like to show a slide of her video testimony [*sic*] of the 1997 [*sic*] to the police where she says she told him [*sic*] the whole story."  The prosecutor objected and asked to approach.  After a sidebar, defendant's trial counsel resumed questioning J., and the video was not displayed to J.

Defendant's trial counsel continued to cross-examine J. on this topic, and she initially testified that she could not recall if the police talked to her about what her mother had told them.  She also testified that she had told the police that she had told her mother that defendant had raped her and that she had told the police that she "told the whole story to my mom."  Upon further cross-examination, she conceded that she had "changed [her] story" after the police told her what her mother had said.  J. testified that she told

the police that she had not told her mother everything because she did not want her mother "to be more upset."

During cross-examination of the detective who had interviewed J., the detective was asked about his interchange with J. regarding what her mother had told the police. Exhibit Z was then played. Exhibit Z is a 12-second video. At the beginning of it, J.'s head is up, and her arms are crossed on the table. Before any dialog occurs, J. drops her head to her arms. The only dialog is the detective's brief statement, which occurs after J. drops her head to her arms. The detective says that J.'s mother had told the police that J. had told her that defendant "tried to have sex" with her but "never did have sex" with her. J.'s head remains on her arms while the detective speaks. Exhibit Z's video terminates abruptly after the detective makes this brief statement. Exhibit Z was played again during defendant's trial counsel's closing argument.

## 2. Analysis

Defendant contends that the trial court's refusal to allow him to use exhibit Z while he was cross-examining J. was a violation of his confrontation rights. As we pointed out earlier, "'the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" (*People v. Wilson*, *supra*, 44 Cal.4th at p. 794.) A trial court has "wide latitude" to "impose reasonable limits" on cross-examination to avoid "confusion of the issues" or to avoid "interrogation that is repetitive or only marginally relevant." (*Delaware v. Van Arsdall*, *supra*, 475 U.S at p. 679.) A limit on cross-examination violates the confrontation clause only if "a reasonable jury might have received a significantly different impression of the witness's credibility had the excluded cross-examination been permitted." (*People v. Quartermain*, *supra*, 16 Cal.4th at pp. 623-624.)

The trial court's limitation on the defense's use of exhibit Z did not violate defendant's confrontation rights. The trial court reasonably precluded use of exhibit Z

during J.'s testimony because exhibit Z was so truncated that it was confusing. At that point, the jury had seen no portion of the interview video. The dialog that *preceded* J. putting her head down was not included in exhibit Z, so it was unclear exactly what had prompted J. to put her head down. In contrast, during its cross-examination of J., the defense was able to elicit from her an admission that she had "changed [her] story" after the police told her that her mother had told them something different about J.'s disclosure to her. While exhibit Z might have added emphasis to that point if it had included the dialog that prompted J. to drop her head, it lacked significance in its absence. Furthermore, it was improbable that the jury would have "received a significantly different impression" of J.'s credibility if only this snippet had been played during J.'s testimony on cross-examination rather than being played twice later in the trial. The defense made its point. J. admitted that her original statement to the police that she had told her mother everything about defendant's assault on her was not true. She also admitted that she had changed her story after the police confronted her with her mother's statement that J. had told her only that defendant had tried to rape her. Showing J. exhibit Z would not have added anything of significance to J.'s admissions, particularly considering that it was shown to the jury twice later in the trial.

### E. Court's Refusal to Redact Comments By Police In Video

Defendant challenges the trial court's refusal to redact statements by the police on the prosecution's video that he argued amounted to the police vouching for J.'s credibility.

### 1. Background

The challenged statements are italicized below. On the video, right after J. describes the incident in the car, the detective responds: "Okay. Um, now I know this is hard for you and I really appreciate your talking to me 'cause *you're doin' really good*." He then asks more detailed questions about the car incident. She provides further details

35

in response to numerous additional questions about the car incident. The detective then says: "Okay. Now, *you're doin' really good*. Okay. *You're doin' really good* and I know this is really hard for you." He then sought additional details. When J. shifts from the car incident to the events at the house, the detective makes similar statements. "Okay. Again, *you're doing really good. You're, you're doing so good, it's unbelievable.* Okay? I, I appreciate that. Now I know this is really hard for you because you don't know me and it's hard to talk about these things and I appreciate that." He moves right into seeking further details about the events at the house.

When J. breaks off her description of the beginning the garage assault, apparently crying, both the detective and the uniformed officer try to encourage her to continue. "It's okay. *You're doin' fine*." "*Doin' real good*." J. provides further details, and the detective continues to encourage her. "Okay. Now this is real difficult and I understand it, but unfortunately I, I need, I need you to tell me exactly as best you can remember what happened when you go in the garage." "Okay. Um, now, again, I, I'm sorry and I kinda get embarrassed in this, too, so it's okay, we all kind of get embarrassed now." J. continues to respond to the detective's questions. After she tells the detective that defendant "made me swallow that white stuff," the detective responds: "Okay. Um, don't take this wrong, I mean, *you're doin' great*, I appreciate it. How, how do you know it was white stuff and it wasn't green or blue stuff." Near the end of the video, after J. has described most of the events in the garage, the detective says "*You are doin' so well, I can't believe it*." J. responds "I've been through this before." The detective asks J. to go through the entire narrative of the garage incident again, and she does so. By the end, she appears to be crying, and the detective says: "*You're doin' really good*, okay?"

After the court ruled the video admissible, the defense sought redaction of the italicized statements. The defense asserted that these statements amounted to "vouching" for J.'s credibility, which would "invade[] the province of the jury . . . ." The prosecutor argued that "[s]imply encouraging a child to talk by saying you're doing okay or you're

36

doing a good job is not vouching for that person's credibility." She asserted that "any minimal issues could be cured with a limiting instruction . . . ." The court denied the defense request for redactions and stated that "a limiting instruction could correct any misimpressions." The defense reiterated its objection when the prosecution introduced the video and transcript, and the court overruled the objection. The defense did not request a limiting instruction, and none was given.

## 2. Analysis

Defendant asserts that the comments by the police on the video amounted to opinion testimony regarding J.'s credibility.

"The general rule is that an expert may not give an opinion whether a witness is telling the truth, for the determination of credibility is not a subject sufficiently beyond common experience that the expert's opinion would assist the trier of fact; in other words, the jury generally is as well equipped as the expert to discern whether a witness is being truthful." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 82.)

We cannot agree with defendant that the challenged statements "vouched for J[.]'s credibility." On the video, the detective's demeanor and questioning are very matter of fact; he is not a particularly sympathetic interviewer. At times, the detective challenges some of J.'s statements with a tone of disbelief. He never says that he believes J. His demeanor in making the challenged comments does not imply that he is validating the truth of her statements. Instead, it is clear that he is simply encouraging her to continue to provide answers to his questions. Most of the challenged comments occur when J. fails to fully answer a question, breaks off her answer, or begins crying. Under these circumstances, the trial court could reasonably conclude that there was no risk that the jury would view the challenged comments as indicating that the police believed J.'s statements to them. Had the defense believed that a limiting instruction was necessary to avoid any such inference, it could have requested one, but it did not. We find no error in the trial court's refusal to redact the challenged comments.

37

**F. Admission of Expert's Testimony That False Accusations Rarely Occur**

Defendant contends that the trial court erred in overruling his objections to testimony on redirect by the prosecution's CSAAS expert that children rarely make false accusations.

### 1. Background

The prosecution's CSAAS expert testified on direct examination about the five components of CSAAS: secrecy, helplessness, entrapment and accommodation, delayed and unconvincing disclosure, and retraction.[13] The expert explained that CSAAS is "an educational tool, not a diagnostic tool," and "[i]t would be improper for me to have an opinion related to whether a particular person was abused or not . . . ."

On cross, defendant's trial counsel asked the expert: "Now, some children who recant or retract their story do that because they weren't ever molested in the first place; right?" The expert responded: "False allegations of sexual abuse do occur, yes." A discussion of recantation rates ensued. The prosecution did not challenge the relevance of this line of questioning despite the fact that there was no evidence that J. had ever recanted her allegations. The expert testified that, although studies produced different estimates of recantation rates varying from 3 percent to 50 percent, he believed that the most reliable study had concluded that the rate was 20 to 25 percent. Defendant's trial counsel then asked the expert: "So, now there are text books and psychological [*sic*] that also talks [*sic*] about retraction in cases where the allegation is simply not true; correct?" The expert responded: "That may well be. I don't know."

The questioning then moved on to the issue of unconvincing disclosures. Defendant's trial counsel asked the expert: "And sometimes children that haven't been

---

[13] Defendant had unsuccessfully sought an in limine ruling excluding or limiting CSAAS testimony.

abused keep giving, as you call it, unconvincing disclosure; right?" The expert responded: "I would imagine that there were children who have not been abused who make a disclosure of sexual abuse, and that disclosure of sexual abuse may not be convincing; but that it not part of [CSAAS] because if you haven't been abused, then we're not talking about [CSAAS]." The expert denied any knowledge about how children who have not been abused make false allegations. Defendant's trial counsel asked: "Well, would you agree with me, Doctor, that sometimes the reason that the disclosure is not very convincing is because it didn't happen." The expert responded: "Again, my professional experience I've had -- not had enough instances to be able to rely upon it. I've had a couple instances where I've been involved in cases where there is a false allegation, and I don't know of any research about how kids who have not been sexually abused and are making false allegation[s] disclose their allegation of abuse. I don't know that -- I don't think I can answer that question." The expert repeated that the premise of CSAAS "is that we're assuming that the child has been sexually abused."

On redirect, the prosecutor elicited the expert's testimony that "there's a lot of controversy with regard to kids retracting." The following colloquy then occurred. "Q [The defense] asked you about false allegations. [¶] A Correct. [¶] Q Has research been done in the area of false allegations? [¶] A Yes. [¶] Q And, specifically, the rate of false allegations? [¶] A There has been research that cited the frequency of false allegations, yes. [¶] Q What has that research shown? [¶] A There's probably maybe ten to fifteen studies, empirical studies, that have looked at rates of false allegations. And there's a caveat here . . . [because] research on something that didn't happen . . . is a really tough thing. [¶] So given that caveat, the rates of false allegations, for most of the empirical studies, fall within the range of about one percent to six percent. Probably the best article which -- and that's why people ask me often does it happen? I usually say very infrequently or rarely. [¶] One of the best studies is a study by . . . Neil Trocme and

39

Bala. It's a Canadian incident study of false allegations. What they found is about one percent of the children who were identified in some form by law enforcement or CPS --"

At this point, defendant's trial counsel moved to strike this testimony "as beyond the cross-examination" and irrelevant. "I don't see how the false allegation evidence is relevant here. It's somewhat misleading to the jury." The prosecutor asserted that he was following up on defendant's trial counsel's questioning about false allegations. Defendant's trial counsel insisted that he "didn't bring up any issues about research on false allegations." He claimed that his questioning had been about the fact that CSAAS "doesn't take into account false allegations." The court overruled the objection. The expert then continued with his answer. "I think I was referring to the Trocme-Bala study, which was a Canadian incident study in which they found about one percent of the cases that came before law enforcement or CPS were deemed to have been false allegations. And in none of those situations did the child make the false allegation; they were made by somebody else besides the child." Defendant's trial counsel renewed his objection, and the court overruled it.

The prosecutor mentioned the CSAAS evidence in her argument to the jury, but she emphasized that the expert "wasn't here to tell you that J[.] was or wasn't assaulted by the defendant . . . ." "[CSAAS] does not diagnose abuse." Defendant's trial counsel expressly referred to the expert's testimony regarding "false accusations." "[The expert] testified that false accusations . . . in sex cases are rare. Well, whether that's true or not, percentages are not what this case, or any criminal case is about. . . . This case is about whether this is a false accusation in this case period."

The court instructed the jury on the limited purpose for which it could use this expert's testimony. "[The expert's] testimony about [CSAAS] is not evidence that the defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not J[.]'s conduct was not inconsistent with the

conduct of someone who has been molested, and in evaluating the believability of her testimony."

## 2. Analysis

Defendant contends that the trial court prejudicially erred in refusing to strike and overruling his objections to the expert's testimony about the rate of false allegations.

The crux of defendant's claim is his assertion that the expert's testimony on redirect that children "rarely" make false allegations was tantamount to saying that J. "was telling the truth." We disagree. The expert testified on cross that "[f]alse allegations of sexual abuse do occur, yes," and he also explained that he himself had been "involved in [a couple of] cases where there is a false allegation." He also testified on direct that "[i]t would be improper for me to have an opinion related to whether a particular person was abused or not . . . ." And the trial court instructed the jury that this expert's testimony was not evidence of the truth of J.'s allegations but only evidence to be used in "evaluating the believability of [J.'s] testimony."

In this context, it is inconceivable that the jury could have understood the expert's testimony about false allegation rates to be a verification of the truth of J.'s allegations particularly in light of the trial court's instruction on the limited use that the jury was permitted to make of this expert's testimony. In sum, the expert's testimony as a whole and the limitations imposed by the instruction rendered it improbable that the jury could have utilized the challenged testimony in any inappropriate way. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) Although defendant asserts that this testimony also violated his federal constitutional rights, he does not elaborate on the federal basis for his argument. His reliance on *McKinney v. Rees* (9th Cir. 1993) 993 F.2d 1378 (*McKinney*) is misplaced. That case found a due process violation where irrelevant evidence was admitted, there were no permissible inferences that could be drawn from it, and it formed a significant part of the prosecution's case. Here, the prosecution did not rely on the false allegation rate evidence but merely elicited it for its relevance to rebut the inference that

41

the defense sought to create that the incidence of retraction among child sexual abuse victims reflected a similar incidence of false allegations. Rebutting that inference was not irrelevant, and this evidence was otherwise insignificant. No federal constitutional violation occurred.

### G. Permitting Video To Go Into Jury Deliberation Room

Defendant claims that the judgment must be reversed because the prosecution's video was mistakenly sent into the jury room when the jury began deliberations despite the fact that the parties and the court had agreed that it would not be.

### 1. Background

The defense objected to the "video going into the jury room." The basis for the objection was that "it gives incredible undue weight to J[.]'s statement because there's not going to be any other videotape . . . going into the jury room." "[T]he practical effect is that it amounts to having [defendant]'s accuser in the room with the jury renewing her accusations against him . . . including places where she is weeping or crying and hugging the dog and so forth, and it really amounts to having the accuser appear live, or post-alive, during the jury deliberations in a very supportive context." The defense claimed that the video "creates an incredible amount of prejudice . . . ."

The prosecutor said "I don't have a problem with treating all of the recording the same as the transcript as if it were a read back request if the jury ask[s] for it later. That's fine." The court said "Okay." Defendant's trial counsel asked: "Does that mean it doesn't goes [*sic*] into the jury room?" The prosecutor responded: "Yes, that's fine." The court said "All right. Anything else?" The court subsequently confirmed that it was "agreed" that the video would not go in to the jury room and that this applied also to "all the recordings" and the interview transcript.

The prosecutor told the jury in her closing argument: "You have the opportunity to see that video, and you can judge for yourself if you think [J.] was just . . . making it

up as she went along." The court told the jury: "These exhibits [that were introduced into evidence at trial] will be sent into the jury when you begin to deliberate. The exception, ladies and gentlemen, are the transcripts of recorded portions of audio and video recordings. We're not sending those in with you, but if you feel the need to review them, we'll make arrangements for you to be able to do that."

After the jury had deliberated for a full day, the court discovered "that the tape, the videotape of the police interview with J[.] and the copy [of] a transcript of that interview prepared by the District Attorney's office had gone to the jury room. Our game plan would ha[ve] been not to have those things go in, and if they asked to have that video played we would address how we would go about doing that at the time that that occurred. [¶] So I'm gathering that they did watch the video because they inquired of the bailiff whether -- wasn't there a defense video also? Which suggests to me they must have watched the one they had. And so I immediately contacted counsel, advised them of the situation, made some suggestions about what we might do. [¶] In the meantime, we've been advised that they now have a verdict. But I believe counsel wanted to go on the record in any case about the situation."

Defendant's trial counsel stated that he would have wanted to ensure that the jury was provided with the defense video and transcripts and the defense version of the transcript of the prosecution's video. He asked that the court "call the jury in and tell them that that was in error for them to have seen the tape . . . in the deliberation room, and that they should disregard what they saw and heard on that tape." He argued there had been "a serious violation of [defendant]'s right to a fair trial here under the California and federal constitution[s]" and sought a mistrial. Defendant's trial counsel reiterated the basis for his original objection to the video going into the jury room. The prosecutor opposed the request that the jury be ordered to disregard the video. Since the video and transcript were in evidence, she saw no error in the jury having been provided with them.

43

The court denied the request and the mistrial motion. "They inadvertently went in. I'm fairly confident that the jury looked at the tape. Whether they looked at the transcript, I have no way of knowing. Whether or not any comparison of the People's version and the defendant's version of the transcript would have made any difference, I have no way of knowing. [¶] The only portion of that interview that the defense made was a portion of it where J[.] lowers her head on the table after hearing her mother contradicted some of [the] things she said or told different things or whatever. That is not only shown by the defense during the trial, but it was also shown by the defense during closing argument. The screen was about three feet from the jurors at the time; so they had a pretty good look at it. So I think that they got the message, whatever it might be from that. [¶] Also, I'm not sure at this stage of the proceedings it would be appropriate to grant a mistrial. I'm not sure where we'd be if I granted a mistrial and then find out the jury acquitted [defendant], which is a distinct possibility."

## 2. Analysis

Defendant claims that the fact that the video went into the jury room was prejudicial error. He acknowledges that there is no California authority for the proposition that it is error to allow a video exhibit to go into the jury room, and he concedes that California statutorily provides that the jury may take all evidence (other than depositions) into the jury room. (§ 1137.) Nonetheless, defendant asks to hold that it is error to allow a jury unfettered access to a video exhibit in the jury room.

Defendant relies on out-of-state cases and, most heavily, on *United States v. Binder* (9th Cir. 1985) 769 F.2d 595 (*Binder*). In *Binder*, the children who had been molested did not testify at trial but instead the parties stipulated to admission of the videotaped *testimony* of the children. (*Binder*, at p. 598.) The jury was permitted to replay a portion of the videotaped testimony during its deliberations. (*Ibid*.) On appeal, the defendant claimed that the district court had abused its discretion in permitting the jury to replay the testimony in the jury room. (*Binder*, at p. 600.) The court emphasized

44

that "[v]ideotape testimony is unique" because it is equivalent to a "live witness," and it distinguished audiotapes, which are not substitutes for live witnesses. (*Binder*, at pp. 600, 601, fn.1.)

*Binder* is readily distinguishable. The video that the jury was allowed to view during deliberations in this case was not "videotaped testimony," as it was in *Binder*. J. testified live at trial. Her testimony was not videotaped, and it was not available to the jury in the jury room except by having the court reporter read it back.[14] In contrast, the video was a recording of her police interview in 1997 when the events were fresh in her mind. The out-of-state cases defendant cites either concerned videotaped testimony, as in *Binder*, or were based on state rules prohibiting unfettered access to videos in the jury room. California has no such rule. These out-of-state rules were premised on the notion that allowing unfettered access poses the danger that the jury may place undue emphasis on the videotaped statements over the trial testimony. (See *State v. Burr* (N.J. 2008) 948 A.2d 627, 636 [adopting procedures allowing trial court to deny replay of video and requiring video playback to occur in open court]; *Young v. State* (Fla. 1994) 645 So.2d 965 [equating videos of witness statements with depositions, which were prohibited in jury room].)

In this case, the video itself was admitted into evidence, and California law does not prohibit the jury from having exhibits available to it in the jury room. While we do not discount the risk that the jury may place considerable emphasis on a video of a witness statement that is available to it in the jury room, this is not a case in which the record can support an inference that the jury placed undue emphasis on the video to the exclusion of other evidence. Although the jury had the video in the jury room, it

---

[14] In fact, the jury specifically requested and received a read back of J.'s trial testimony.

specifically requested and received a read back of J.'s *trial testimony* and of the trial testimony of two other witnesses. In any case, there is no basis in the record upon which we could base a conclusion that a verdict more favorable to defendant would have occurred if only the jury had been required to view the video in the courtroom rather than being permitted to do so in the jury room.

Defendant contends that the record demonstrates that the presence of the video in the jury room was prejudicial to him. He relies on the court's statement that the jury had "inquired of the bailiff whether -- wasn't there a defense video also?" He sees this comment as an unfulfilled request for exhibit Z, which apparently was not in the jury room. We do not agree with his interpretation. Exhibit Z was the only video introduced by the defense. As we have already pointed out, it was played to the jury twice at trial including during the defense closing argument. Since it was only 12 seconds long, it was highly unlikely that the jury had forgotten what it depicted. The juror's comment to the bailiff seems more likely to have been an acknowledgement that the juror recalled exhibit Z than a request for it. Had the jury really desired a replay of exhibit Z, it could have requested it in the same manner that it had requested read backs. Its failure to do so reflects that it did not desire a replay of exhibit Z.

### H. Wrong Version of Video In Jury Deliberation Room

Defendant contends that reversal is required because exhibit 25A, the video sent into the jury room, was not the same version of the prosecution's video that had been shown during trial due to an inadvertent editing mistake by the prosecutor.

### 1. Background

After the court denied the defense request for redactions to the video, the following colloquy occurred. "[The Prosecutor]: For the record, during this section, there is the mention of the defendant's parole, which I deleted from the transcript, and I plan to mute the tape during that admonition. [¶] THE COURT: Okay. Well, just make

sure we don't screw this up. [¶] [The Prosecutor]: I have the times written down." The prosecutor thereafter played the video for the jury. The transcript of the video that the prosecutor played for the jury includes this passage: "KW [the detective]: Oh. Well, does E-, does Eddie [defendant] live at the house? [¶] [J.]: He used to. [¶] KW: He used to? How long ago did he live there? [¶] [J.]: A month before we moved in, so about three months, he hasn't lived there. [¶] KW: Okay. What was he doing over at . . . when did this happen? [¶] [J.]: About two weeks ago. [¶] KW: Two weeks ago? Okay. And, and why was Eddie over there visiting? Do you know?"

The prosecutor subsequently, "with the permission of the Court and opposing counsel, substituted a redacted DVD into evidence prior to the case and exhibits being submitted to the jury." Due to her "not exact" "editing" of the video, "a few more seconds than necessary" were redacted from the substituted DVD. At the close of evidence, the following colloquy occurred: "THE COURT: On that substitute CD [*sic*], have you checked that? [¶] [The Prosecutor]: Yes I have that here. [¶] THE COURT: Make sure what is on it is what you think. [¶] [The Prosecutor]: Yes. I played it."

The video that actually went into the jury room (exhibit 25A) was not the same as the one that had been played for the jury. Instead of the passage quoted above from the interview transcript (exhibit 25), it was truncated: At about 2 minutes and 40 seconds into the video, the detective asks J. if defendant lives at the house. J. shakes her head and says "unh unh he used to . . . two weeks." There is a fairly obvious discontinuity in the video between "used to" and "two weeks." The video thereafter tracks the interview transcript with the detective saying "Two weeks ago? Okay. And, and why was Eddie over there visiting? Do you know?"

Defendant's supplemental new trial motion asserted that he had been prejudiced by the wrong version of the video going into the jury room. He argued that the edited version of the video sent in to the jury room suggested that defendant was still living in the house when the incident occurred. The trial court denied the motion.

47

## 2. Analysis

While the substitution of the inexpertly edited video for the one shown to the jury at trial was unfortunate, defendant could not have been prejudiced by it. It was undisputed at trial that defendant did not live at the house where J. resided at the time of the events in question. The prosecutor asked J. on direct: "Did [defendant] ever live in the house that you lived in with your mom and Doug?" J. answered: "I believe prior to -- before me and my mom moved in." On cross-examination, J. testified unequivocally that defendant "never lived in the house" when she lived there.

In view of this undisputed evidence, which was consistent with the interview transcript, the jury could not have viewed the error in the video to establish otherwise. Even on its own, the editing error was not likely to be taken to mean that defendant lived in the house at the time of the incident. When the detective asked J. "does [defendant] live at the house" on the video sent into the jury room, J. shook her head and said "unh unh he used to . . . two weeks." Two factors disconnected the "used to" from the "two weeks." One was the visible discontinuity between J.'s clear response that defendant did not live in the house but used to and her "two weeks" statement. The jury would know that something was left out, which would necessarily tell it that the two statements were not related. More importantly, the detective's immediately following question about "why" defendant was "over there *visiting*" when he assaulted J. confirmed that defendant was not residing there at that time. (Bold italics added.) No possible prejudice could have resulted from the prosecutor's mistake in editing the video sent into the jury room.

## I. Cumulative Prejudice

Defendant contends that the cumulative prejudice from multiple errors requires reversal of the judgment. The only errors we have found concern the expert's testimony about false accusations and the presence of the inexpertly edited video in the jury room. The expert's testimony about the rate of false accusations was fleeting and was not

mentioned by the prosecution in argument. The jury's access to the edited video, rather than the correct video, in the jury room, rather than in the courtroom, did not pose a substantial risk of prejudice to defendant. Neither individually nor cumulatively did these minor mistakes influence the outcome of defendant's trial.

## J. Juror Misconduct

Defendant argues that the trial court prejudicially erred in refusing to grant his motion for a new trial based on juror misconduct and in refusing to hold an evidentiary hearing on juror misconduct.

### 1. Background

The court instructed the jury: "A defendant has an absolute constitutional right not to testify. He may rely on the state of the evidence and argue that the People have failed to prove the charges beyond a reasonable doubt. Do not consider for any reason at all the fact that the defendant did not testify. Do not discuss that fact during your deliberations, or let it influence your decision in any way."

Defendant's supplemental new trial motion asserted that a new trial was warranted due to juror misconduct.[15] He alleged that the jurors had committed misconduct by discussing the fact that defendant had not testified at trial. Attached to his motion were *unexecuted proposed declarations* of three jurors, an executed declaration of an alternate juror, and an executed declaration of a defense investigator. One of the unexecuted proposed juror declarations and the defense investigator's declaration asserted that the jurors had discussed defendant's failure to testify.

---

[15] Defendant initially moved for a new trial on various grounds not including juror misconduct. His supplemental motion also sought a new trial on additional grounds.

49

The investigator stated that he had talked to one juror, and she had told him "that during jury deliberations she brought up the issue of [defendant] not testifying in his own behalf. She said the issue of [defendant] not testifying was discussed in the jury room by herself and the other jurors as a group. Everyone who discussed the issue said that had they been in [defendant's] position they would have testified."

The unexecuted proposed declaration was prepared for the juror with whom the investigator had spoken. According to the investigator, the juror did not dispute the accuracy of the proposed declaration, but she refused to sign it "because her experience as a juror on the case had been emotionally upsetting and she was concerned that signing the declaration would involve her further in the case."

The prosecution opposed the motion on the ground that defendant had failed to produce competent evidence of juror misconduct. It pointed out that an unsigned declaration lacked any evidentiary value and that the investigator's statements were hearsay.

The prosecution also produced the executed declarations of two jurors. One of these jurors stated: "I do recall there was a discussion about [defendant] not testifying and we all acknowledged that we were not supposed to take his not testifying into consideration. This was a group discussion. I was the floor person when the comment was made of [defendant] not testifying [and] I told the jury that this was not to be taken into consideration during deliberations and that we could not consider his not testifying in our decision." The matter "came up" at a point when a juror was looking at the case "as a 'he said, she said'. Her word against his word. This is when it came up, that we didn't have his word. After I discussed with the jury that this was not something we could consider, it was accepted and the conversation about him not testifying stopped." The other juror stated: "I recall that one juror mentioned that maybe [defendant] was part of the 'three strikes' and this is why he didn't testify. When this statement was made other jurors stated that the fact of [defendant] not testifying was not to be considered, that we

50

could not consider this during the deliberation and that we could not use [the] fact of his not testifying in our decisions. This was accepted among the jurors." "This was not something that we dwelled on or spent more than one to two minutes talking about. This was a conversation that took place with the whole jury not just a few jurors."

At the hearing on the motion, defendant's trial counsel asked the court if it "is prepared to accept unsigned declarations" from the jurors. The court said "they are not competent evidence" and declined to consider them. Defendant's trial counsel then sought to call the three jurors, whom he had subpoenaed and who were present, to testify at the hearing. He asserted that their testimony would be very brief. The prosecutor objected on the grounds that "[t]his is not an evidentiary hearing," and "[i]t is inappropriate to call jurors to the stand as witnesses." The court refused to permit the jurors to testify. "The court feels it's inappropriate to drag jurors in here at this kind of proceeding without any notice or justification or authorization by the Court. The purpose of proceeding by declaration is for the Court [to] decide whether or not it's appropriate to pursue the matter any further. I don't think the defense is authorized to go off on its own to start dragging [them] into court. [¶] The Court refuses to listen to this." "[T]he Court will not allow you to proceed in that fashion." "The Court feels that you're proceeding in an unlawful fashion dragging jurors into court without any authorization from the Court . . . ."

Defendant's trial counsel requested an evidentiary hearing, and the court "absolutely denie[d] that." The prosecutor argued that "the only declarations properly before the Court are those [provided by the prosecution]. And they clearly state what occurred in terms of any reference to the defendant not testifying . . . ." She asserted that these declarations established the absence of misconduct. "The jurors did exactly what they are supposed to do during deliberations when the subject of the defendant not testifying came up." The trial court denied the new trial motion.

## 2. Analysis

"'When a party seeks a new trial based upon jury misconduct, a court must undertake a three-step inquiry.  The court must first determine whether the affidavits supporting the motion are admissible.  (See Evid. Code, § 1150, subd. (a).[16].)  If the evidence is admissible, the court must then consider whether the facts establish misconduct.  [Citation.]  Finally, assuming misconduct, the court must determine whether the misconduct was prejudicial.  [Citations.]'"  (*People v. Hord* (1993) 15 Cal.App.4th 711, 724 (*Hord*).)  "We accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence"; the question of "[w]hether prejudice arose from juror misconduct, however, is a mixed question of law and fact subject to an appellate court's independent determination."  (*People v. Nesler* (1997) 16 Cal.4th 561, 582.)  Essentially, the question of whether misconduct actually occurred is reviewed for substantial evidence, while the question of whether any misconduct was prejudicial is subject to independent review.  There is a rebuttable presumption that juror misconduct is prejudicial.  (*People v. Holloway* (1990) 50 Cal.3d 1098, 1108-1109, disapproved on a different point in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn.1.)

The unexecuted proposed juror declaration produced by the defense obviously did not constitute admissible evidence of juror misconduct.  Nor did the investigator's declaration recounting the juror's hearsay statements.  We need not consider in this case

---

[16]    "(a)  Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly.  No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined.  [¶]  (b) Nothing in this code affects the law relating to the competence of a juror to give evidence to impeach or support a verdict."  (Evid. Code, § 1150.)

whether the trial court abused its discretion in refusing to hear testimony from the subpoenaed juror at the hearing because the prosecution's properly executed juror declarations established the same misconduct that the defense sought to show.

The defense sought to present evidence that defendant's failure to testify "was discussed in the jury room by . . . [the] jurors as a group," and that the jurors stated that "had they been in [defendant's] position they would have testified." The prosecution presented evidence that defendant's failure to testify was discussed by the jurors as a group for "one to two minutes" after one juror mentioned that "we didn't have [defendant's] word." Another juror "told the jury that this was not to be taken into consideration during deliberations and that we could not consider his not testifying in our decision," and the other jurors "all acknowledged that we were not supposed to take his not testifying into consideration." There was no further discussion of defendant's failure to testify. Since the defense's request for an evidentiary hearing was made solely to overcome the absence of a sworn declaration establishing misconduct, and the prosecution's declarations established the very same misconduct, any error in denying an evidentiary hearing was harmless.

The critical question is whether the presumption of prejudice that arose from the showing of juror misconduct was rebutted.[17] We conclude that it was.

---

[17] In his reply brief, defendant contends that it was also misconduct for one of the jurors to mention "three strikes." The only evidence of this was in one of the declarations produced by the prosecution. The defense never argued below that this constituted misconduct or sought a new trial based on it. Since defendant did not make this assertion in his opening brief, we decline to consider it. "'[T]he rule is that points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before.'" (*People v. Smithey* (1999) 20 Cal.4th 936, 1017, fn. 26.) Defendant makes no attempt to justify his failure to raise this contention in his opening brief.

53

In *People v. Leonard* (2007) 40 Cal.4th 1370 (*Leonard*), several jurors discussed during penalty phase deliberations that defendant had not testified and that they would have liked to have heard defendant testify at the penalty phase. (*Leonard*, at p. 1424.) Defendant claimed that this was prejudicial misconduct. Although the California Supreme Court agreed that the jurors had committed misconduct, it found that the presumption of prejudice had been rebutted. "[T]he purpose of the rule prohibiting jury discussion of a defendant's failure to testify is to prevent the jury from drawing adverse inferences against the defendant, in violation of the constitutional right not to incriminate oneself. Here, the comments on defendant's failure to testify . . . merely expressed regret that defendant had not testified, because such testimony might have assisted the jurors in understanding him better." (*Leonard*, at p. 1425.) The California Supreme Court agreed with the trial court's conclusion that "'merely referencing that they wish he would have testified is not the same as punishing the Defendant for not testifying. It is not the same as drawing negative inferences from the absence of testimony.'" (*Ibid.*)

In *Hord*, *supra*, 15 Cal.App.4th 711, a child molestation case, several jurors commented during deliberations on the defendant's failure to testify. (*Hord*, at pp. 721-722.) The foreman of the jury interrupted the discussion and told the jurors that they were not permitted to consider the defendant's failure to testify in deciding the case. (*Hord*, at p. 722.) There was no further discussion of the matter. (*Ibid.*) The defense moved for a new trial based on juror declarations and sought an evidentiary hearing. The prosecution submitted additional juror declarations clarifying the nature of the misconduct. The trial court denied the motion without an evidentiary hearing. (*Hord*, at p. 723.) The Court of Appeal affirmed. "When jury deliberations have been infiltrated with a matter which is prohibited, one must look at the nature of what has improperly infiltrated the procedure and the possibility of prejudice." (*Hord*, at p. 727.) "Transitory comments of wonderment and curiosity, although misconduct, are normally innocuous, particularly when a comment stands alone without any further discussion." (*Hord*, at

pp. 727-728.) Because the discussion was not lengthy and "the foreperson admonished his fellow jurors and reminded them they could not consider defendant's not testifying during deliberations," the court concluded that the presumption of prejudice had been rebutted. (*Hord*, at p. 728.)

Defendant makes no attempt to distinguish *Hord* and *Leonard* and instead relies on *People v. Cissna* (2010) 182 Cal.App.4th 1105 (*Cissna*). In *Cissna*, also a child molestation case, one of the jurors discussed the case with a friend on a daily basis throughout the trial. (*Cissna*, at p. 1114.) The friend advised the juror on how he should consider the evidence and explicitly told the juror that the defendant's failure to testify would mean he was guilty. (*Cissna*, at pp. 1114-1115.) The trial court found that the misconduct was not prejudicial. (*Cissna*, at p. 1115.) On appeal, the sole issue was whether the presumption of prejudice had been rebutted. (*Cissna*, at pp. 1116, 1117.) The Court of Appeal found that the presumption had not been rebutted because the juror's discussion of the case with his friend was "both pervasive (occurring every single day of the trial) and substantive (involving deliberative-type discussions about the merits of the case)." (*Cissna*, at p. 1118.) The juror had not only violated the court's instructions not to discuss the case prior to deliberations and not to discuss the case with a nonjuror, but had also allowed an outside source to exert influence over him. (*Cissna*, at pp. 1118-1121.) The *Cissna* court distinguished *Hord* and *Leonard*. "The fact that Juror D. discussed defendant's silence with G. [(his friend)] reflects that Juror D. considered this factor. Further, the fact that Juror D. repeatedly ignored clear instructions not to discuss the case supports that he equally ignored the court's instruction not to factor in defendant's silence when deciding the case. This improper influence obviated the defendant's constitutional right not to have his silence play any role in his conviction." (*Cissna*, at p. 1121.)

The misconduct that occurred in this case is dissimilar from the misconduct in *Cissna* and quite similar to that in *Hord* and *Leonard*. Unlike the misconduct in *Cissna*,

55

no outside influence was involved here, and no one said that defendant's failure to testify meant he was guilty. Unlike in *Cissna*, the misconduct was neither pervasive nor substantive. Instead of the days of substantive discussions, as in *Cissna*, here there was a very limited discussion lasting no more than two minutes. Unlike in *Cissna*, this brief discussion was immediately terminated after a juror reminded the others that they were not to consider this issue. In the same ways that this case is distinguishable from *Cissna*, it is like *Hord* and *Leonard*. As in *Leonard* and *Hord*, the jurors' mere acknowledgement that defendant had not testified did not imply that they were utilizing that fact against him. As in *Hord*, the discussion was brief and was terminated by a juror's admonition that they were not to consider the matter. While the jurors committed misconduct by violating the court's instruction not to mention defendant's failure to testify, the presumption of prejudice was rebutted by evidence that the discussion was brief, nonsubstantive, and immediately terminated by an admonition that this was a matter that they were prohibited from considering. Consequently, the trial court did not err in denying defendant's new trial motion based on juror misconduct.

## V. Disposition

The judgment is affirmed.

56

_____
Mihara, J.

WE CONCUR:


_____
Elia, Acting P. J.


_____
Márquez, J.